STATE

v.

John CHAKOUIAN.

No. 86–522–C.A.

Supreme Court of Rhode Island.

Feb. 11, 1988.

James E O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

SHEA, Justice.

On June 27, 1986, John Chakouian was convicted of first-degree murder in violation of G.L. 1956 (1981 Reenactment) § 11–23–1. He was sentenced to a mandatory life term at the Adult Correctional Institutions as required by § 11–23–2. We affirm.

In the early-morning hours of March 15, 1975, a Rehoboth, Massachusetts police officer was patrolling the southern portion of Rehoboth from Route 44 to Route 6. At approximately 1:30 a.m., he drove past an area known as the Old Brook Street gravel pit and observed nothing unusual. At ap-

proximately 6 a.m., he drove past the same area and this time observed tire tracks in the snow of a dirt lane leading to the gravel pit. The officer followed the tire tracks and eventual footprints to a small area that appeared to have been recently disturbed. The ground there was soft and several branches had been placed over it. He also noticed dark red marks, apparently blood stains, in the snow nearby. He radioed for assistance. The area was dug up, and the blood-soaked corpse of Richard "Dickie" Callei (Callei) was discovered.

An autopsy revealed that Callei had been shot five times in the back at close range. He had also suffered multiple stab wounds in several areas on the front of his body as well as slashing cuts across his face. Finally, he had multiple blunt instrument injuries, the most severe of which were visible on the face and head.

Despite the early discovery of Callei's body, the police were unable to solve the murder until eight years later when they received the cooperation of several key participants-turned-state's-witnesses, the most important of whom was Frank Martellucci. (Hereafter the principle parties will be referred to by their last names.) Martellucci began talking with police in October of 1983 while serving time on a separate offense. His testimony revealed the following sequence of events.

Martellucci and defendant were members of a so-called crew of wise guys headed by Frank L. "Bobo" Marrapese. The crew used to frequent the Acorn Club, which was operated by Marrapese and located on Acorn Street in the Federal Hill section of Providence.

On March 14, 1975, Martellucci and defendant met with Marrapese at the Acorn Club. Marrapese told them that he needed a deep grave dug outside the Rhode Island area. He said that somebody would be going into the grave very soon. Martellucci and defendant drove to the previously described area in Rehoboth, Massachusetts, and dug the grave.

That evening Martellucci and defendant returned to the Acorn Club. They noticed that Marrapese and several other members of his crew were in the establishment. They sat at a table at the far end of the bar. Soon thereafter they were joined by two girlfriends.

Later that evening Callei entered the club. Callei was recognized as a powerful leader of a separate crew operating out of the Federal Hill section of Providence. Martellucci and defendant were surprised to see Callei because he had never been to the Acorn Club late in the evening, and it was known that there were "bad feelings" between Marrapese and Callei. Callei sat at a bar with certain members of Marrapese's crew.

A short while after Callei's arrival, Marrapese went over to Martellucci and defendant and asked them in a whisper if either had a gun. The defendant responded that he had a gun as well as gloves in his car. Marrapese instructed them to send their girlfriends home and to get the gun and gloves.

Martellucci and defendant followed the instructions. When they returned to the club, defendant handed his gun and gloves to Marrapese. Marrapese then walked behind the bar and engaged Callei in conversation. While the two crew leaders were laughing and joking, Marrapese came from behind the bar to Callei's rear, put his left hand on Callei's shoulder, and fired five shots into Callei's back. Callei fell to the floor, and Marrapese and another member of the Marrapese crew kicked Callei several times in the head. After Callei's body was placed in the trunk of Callei's car, Marrapese stabbed the corpse several times in the chest with a knife. The defendant then drove Callei's car to Rehoboth and met Martellucci at the site. They deposited Callei's body in the hole they had prepared.

The central issue of the case, in our opinion, is the admission into evidence of two plea agreements between the state and two of the participants-turned-state-witnesses, one of which included the chief prosecution witness, Martellucci. The defendant argues that this constituted improper vouching by the government for their witnesses' credibility. Objection was raised to the following provisions within

the two government witnesses' plea agreements:

"1. The defendant agrees to testify truthfully on any matters about which he has or will be interrogated, or at any trial, before any Grand Jury, or at any judicial proceeding at which he is questioned by the prosecution, the defense, or the Court.

" * * *

"6. If at any time the defendant gives false information to the State or testifies falsely at any trial or judicial proceeding or before any Grand Jury whether questioned by the prosecution, defense, or the Court, this entire agreement will be automatically rendered null and void and will be of no force and effect.

"7. If at any time the defendant gives false testimony before any Grand Jury or at any trial or judicial proceeding, he will be charged with and prosecuted for perjury and/or making false statements."

The defendant also objected to the signatures of the assistant attorney general and the superintendent of the Rhode Island State Police along with the names of their titles of office at the bottom of the plea agreements.

■ "It is improper for the prosecution to vouch for the credibility of a government witness." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980). "Attempts to bolster a witness by vouching for his credibility are normally improper and error." *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977).

■ Vouching occurs when the government says or insinuates that it has "special knowledge" that its witness is testifying truthfully. *People v. Buschard*, 109 Mich. App. 306, 316, 311 N.W.2d 759, 764 (1981); *see also Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S. Ct. 311, 323 n. 15, 2 L. Ed. 2d 321, 335–36 n. 15 (1958). Vouching also occurs if the prosecution "place[s] the prestige of the government behind the witness * * * ." *Roberts*, 618 F.2d at 533; *see also United States v. Martin*, 815 F.2d 818, 823 (1st Cir. 1987).

■ One means through which improper vouching may occur is by admission of plea agreements phrased in a manner that suggests that the government has special knowledge that its witness is speaking the truth. Because of this potential danger, courts should closely scrutinize the language of plea agreements before allowing them into evidence.

■ The mere statement in a plea agreement that a witness promises to speak "truthfully" does not by itself constitute improper vouching. *Buschard*, 109 Mich. App. at 316, 311 N.W.2d at 764. This "is the same promise he or she makes when called as a witness at trial." *United States v. Leslie*, 759 F.2d 366, 378 (5th Cir. 1985). Similarly, a statement in a plea agreement that perjury charges will be brought if the defendant makes any false statement under oath is law already known by most jurors even without instruction by the court.

Thus, in order to find reversible error for admittance of a plea agreement on grounds of improper vouching there must be additional improper insinuations by the government. As aptly stated by the Court of Appeals of Michigan:

"Based upon the state and federal decisions cited above, we cannot hold that *any reference* to a plea agreement containing a promise of truthfulness is *in itself* grounds for reversal. A more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Buschard*, 109 Mich. App. at 316, 311 N.W.2d at 763–64.

An example of a case in which the prosecution made improper insinuations of "special knowledge" to the jury, discussed in *Buschard*, is *United States v. Roberts*, supra. In *Roberts*, after admitting a plea agreement in which the chief government witness promised to speak "truthfully," the prosecutor told the jury during final argu-

ment that if the witness testified falsely, his "charges of first-degree murder would be reinstated, and he would stand a very good likelihood of going to the gas chamber." *Roberts*, 618 F.2d at 533. He also pointed to a police officer in the audience who never testified and told the jury that the officer's "mission" was to listen to the chief witness's testimony. *Id.* The Ninth Circuit correctly reversed the conviction for improper vouching and prosecutorial misconduct.

■ Along with the promise to speak truthfully and the statements explaining the repercussions for giving false testimony, the plea agreements before us include the signatures of the assistant attorney general and the superintendent of the Rhode Island State Police along with the names of their titles of office. These two individuals are particularly well known and well respected in Rhode Island. Neither of them testified or were subject to cross-examination. The defendant argues that through these signatures the prosecution improperly placed the prestige of the government behind the witness. We do not, however, have to presently determine whether these signatures should have been edited out of the documents. Because of the overwhelming amount of evidence accumulated against defendant in this particular case, if any error was committed, it was harmless.

As a second ground for appeal, defendant claims that the trial justice erred by failing to dismiss his indictment during pretrial hearings. The defendant argued to the court that the prosecutor who presented defendant's case to the grand jury failed to instruct the grand jurors on the elements of murder. However, the government responded that on several previous matters the prosecutor had provided the same grand jurors with a detailed legal definition of the crime. After reviewing the grand jury transcripts, the trial justice found that the grand jurors had been adequately instructed.

The dismissal of an indictment is an extraordinary sanction. *State v. Manocchio*, 497 A.2d 1, 12 (R.I. 1985). To dismiss an indictment on review "means that even though a jury unanimously found a defendant guilty beyond a reasonable doubt, we would nevertheless void his conviction because the prosecution had made a misstep in obtaining a grand jury determination of probable cause. Hence, the sanction sought is reserved for very limited and extreme circumstances." *State v. Romano*, 456 A.2d 746, 750 (R.I.1983).

■ Obviously, it is the better practice for the prosecutor to instruct the grand jury on the elements of each charge in every matter before it. However, the trial justice was correct in his ruling that the grand jurors in this case "were adequately instructed on elements of murder during previous matters." Clearly this is not an "extreme circumstance" that merits dismissal of an indictment. *See United States v. Kenny*, 645 F.2d 1323 (9th Cir.1981).

The defendant next claims that the trial justice erred in refusing to grant defendant's request for a *Batson* inquiry, after the prosecutor challenged two black members of the panel. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court ruled that when a defendant makes a prima facie showing of discriminatory use of peremptory challenges, the court must inquire into the prosecution's motives. "The prosecutor * * * must articulate a neutral explanation related to the particular case to be tried." *Id.* at 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

■ However, in the present case, defendant failed to make even a prima facie showing of discrimination. "To establish [a prima facie showing of discrimination], the defendant first must show that he is a member of a cognizable racial group * * * and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race*." (Emphasis added.) *Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. The defendant objected to the elimination of *black* members of the panel; the defendant is *white*. Accordingly, the court was not required to conduct a *Batson* inquiry.

The defendant next asserts that the trial justice improperly limited his cross-examination of the witness Martellucci. At trial Martellucci revealed that before testifying, he read the transcripts of his own earlier testimony before the grand jury. Defense counsel then asked Martellucci two questions concerning his motive for reading these transcripts. The trial justice sustained objections to these questions. Defense counsel now claims that he was denied the opportunity to present his theory of the case, namely that Martellucci had manufactured his testimony.

■ The defendant's argument is simply not consistent with the record. Immediately after the trial justice sustained these objections the following colloquy took place:

"Q. [By defense counsel.] Did you have some question about your ability to remember things?

"Prosecutor. Objection.

"The Court. He may answer the question.

"A. [By Martellucci.] * * * I don't understand the question.

"Q. Was there some question in your mind, Mr. Martellucci, that you might not remember everything that [the prosecution] was going to ask you?

"A. No. I just wanted to make sure everything I said was there.

"Q. You were concerned the stenographer might have left something out?

"A. Yes, you never know."

Clearly, defendant was able adequately to inquire into Martellucci's motives for reading his former testimony. Any error that may have occurred by the initial foreclosure of cross-examination was immediately rectified during this colloquy. *See State v. Soto*, 477 A.2d 945, 948 (R.I. 1984).

■ The defendant, on cross-examination, asked the witness William Ferle whether he had stated, at a former time, that Martellucci had lied under oath. The trial justice sustained the state's objection to this question. The defendant argued at side bar that the purpose of this testimony was to show either that Ferle had read Martellucci's former testimony or that

Ferle had discussions with Martellucci concerning Martellucci's former testimony. The defendant now claims it was error to prohibit this inquiry.

The trial justice ruled correctly. We have stated on several occasions that the assessment of the credibility of a witness is within the exclusive domain of the jury and that it is inappropriate to allow one witness to comment on the credibility of another witness. *See, e.g., State v. Desmarais*, 479 A.2d 745, 748 (R.I. 1984); *State v. Nicoletti*, 471 A.2d 613, 617 (R.I. 1984).

The defendant next argues that the trial justice erroneously limited his direct examination of the witness Richard DiOrio. The defendant points to several instances in which the trial justice sustained objections to defense counsel's questions, which he claims should have been allowed.

In July of 1981, DiOrio and Martellucci were convicted on a separate charge of murder and mayhem in a joint trial in New Bedford, Massachusetts. They were both sentenced to eighteen- to twenty-year terms in a Massachusetts prison. At defendant's trial DiOrio testified that he was innocent of the Massachusetts charges. He maintained bitter feelings toward Martellucci while he was serving the Massachusetts sentence because he felt that Martellucci could have exonerated him at trial. He also felt that it was within Martellucci's power to come forward and exonerate him. In order to pressure Martellucci to come forward with exculpatory evidence, he contacted law enforcement officials regarding Martellucci's role in the Callei killing. Although DiOrio was not present at the Callei killing, he learned some information concerning the killing from Martellucci while they were in prison together. In order to make his story more credible to the law enforcement officials, he fabricated several of the details.

■ At trial, DiOrio admitted that he had told law enforcement officials and the grand jury that on the morning of March 15, 1975, he saw Callei bound and gagged in the cellar of the Acorn Club. This version of the story directly contradicted Martelluc-

ci's version of the story. When defense counsel inquired into DiOrio's source of information for this story, the trial justice sustained the state's objection. The defendant argues that this information was relevant and that the trial justice committed error by sustaining the state's objection.

The record reveals that defendant was able to ascertain the source of the information during a later question:

"Q. [By defense counsel.] Did you tell the police—did Frank Martellucci tell you, okay, that the body of Callei was in the cellar of the Acorn Social Club bound and gagged and that Frank 'Bobo' Marrapese stuck him with an ice pick?

"A. [By DiOrio.] No.

"Q. Did you tell the State Police that?

"A. *Yes, I made that up.*" (Emphasis added.)

Accordingly, no error was committed.

Similarly, defendant claims that he was prevented from inquiring into DiOrio's motives for giving false statements to the police and the grand jury. Once again, the record reveals that defendant explored this issue in depth. DiOrio explained that he had fabricated his story in order to make it more credible to law enforcement officials and the grand jury.

The defendant also claims that it was error for the trial justice to limit examination of DiOrio with regard to whether he was still serving time on his Massachusetts sentence or if he had been released. The record clearly shows that Martellucci came forward and exonerated DiOrio.

■ The defendant next asserts that it was error for the trial justice to sustain objections concerning the location of DiOrio's lodging while he was under subpoena at the present trial. The trial justice was correct in prohibiting disclosure of such information. DiOrio was under the protection of a witness-protection agreement. He was living in fear of his life. Any disclosure concerning his lodging might have led to attempts on his life.

■ The defendant also argues as a ground for appeal that the trial justice should have granted a new trial because of the presence on the jury of an unqualified juror. The trial justice had learned that this juror's voting registration had lapsed because of failure to vote during the preceding five years. However, not only did defendant waive objection to her presence, he *emphatically* objected to her removal.[1] "[A] party who knows or by the exercise of reasonable diligence on the voir dire examination should have known of a juror's disqualification waives the right to object thereto by waiting to raise the objection until after the verdict." *State v. Berberian,* 118 R.I. 413, 416, 374 A.2d 778, 780 (1977).

The defendant raises four additional issues in his brief. They concern the propriety of the state's opening statement to the jury that Martellucci would testify he had pleaded guilty to second-degree murder, the court's limitation of cross-examination of witness Ferle about the defendant's membership in the Marrapese crew, the issue of whether the court should have honored the state's request that cameras not focus on DiOrio, and the denial of the defendant's motion for judgment of acquittal. We have reviewed the defendant's arguments on these issues, and we are of the opinion that they are without merit.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers of the case are remanded to the Superior Court.

1. The defendant's counsel stated, "I object to her removal. I recognize what the statute says. However, I would object to her being removed for that purpose."