**STATE**

v.

**Russell J. DUFAULT, Jr.**

**No. 86–380 C.A.**

Supreme Court of Rhode Island.

April 29, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for plaintiff.

Barbara Hurst, Asst. Public Defender, for defendant.

**OPINION**

KELLEHER, Justice.

The defendant, Russell J. Dufault, Jr.(Dufault), was convicted by a Superior Court jury of two counts of robbery at a Dairy Mart, a convenience store in Pawtucket. He now appeals from this judgment of conviction and from the denial of his motion for a new trial. His appellate counsel raises four issues for this court's consideration.

First, Dufault contends that a Superior Court justice erred in denying his motion to dismiss the indictment. On June 19, 1985, Dufault filed a motion to dismiss on grounds that his trial had not commenced within 180 days as required by the Inter-

state Agreement on Detainers Act (IAD), G.L. 1956 (1981 Reenactment) chapter 13 of title 13. *See* § 13–13–2, art. III(a).[1]

In an affidavit filed with his motion, Dufault stated that in August 1984, he received notice of a warrant referring to Rhode Island's pending indictment. At that time he was incarcerated at the Concord Correctional Facility in Massachusetts, serving a prison sentence of fifteen years. Dufault stated that on September 25, 1984, he sent a notice of imprisonment, waiver of extradition, and request for disposition of the indictment pursuant to the IAD. He sent these documents to "District Attorney, Fifth Rhode Island District Court, Providence County, Providence, Rhode Island."

On December 11, 1985, Dufault filed a second motion to dismiss on the same grounds. In connection with this motion Dufault filed an affidavit from Paul Broskie, assistant to the superintendent at the Massachusetts prison facility. Broskie stated that two detainers were lodged by Rhode Island authorities against Dufault while he was incarcerated at Concord. He said that Dufault was serving a fifteen-year sentence after having been returned on August 28, 1984, as a parole violator. Broskie attested that Dufault executed documents "pursuant to the Interstate State Rendition Papers" and mailed them "to the appropriate Rhode Island Court on or about September 25, 1984."

In a January 22, 1986 decision the Superior Court justice denied Dufault's motion to dismiss. Dufault argues that even if the IAD was not properly invoked on September 25, 1984, the invocation of the IAD was effective as of October 9, 1984. The Superior Court justice disagreed. He stated that the necessary forms were never received by the Rhode Island attorney general's department.

■ In faulting the trial justice's denial of his motion to dismiss the indictment, Dufault argues that he should not be held responsible for the procedural deficiencies that occurred in the processing of his request that he be brought to trial for the Pawtucket holdup. However, in *State v. Moosey,* 504 A.2d 1001, 1002 (R.I. 1986), we noted that a majority of state courts have construed the IAD's 180–day proviso as meaning that the 180 days begin to run on the day the prosecution receives a prisoner's request that the pending charges be tried. *See* 98 A.L.R.3d 160 15(a)(1980). In endorsing this view, we believe that our state legislature, when enacting the IAD, never intended that the prisoners would be entitled to a dismissal of the charges pending against them because their request and notice was either lost or delayed in the mail. Parenthetically, we would point out that the attorney general's department has never been located in any of the state district courts.

Turning to the actual trial, Dufault believes that because of several errors, his motion for a new trial should have been granted. First he contends that the photographic array shown to the witnesses by the Pawtucket police was highly suggestive because none of the other pictures matched the description of the robber given by the eyewitnesses and because his picture was "so grossly out of proportion to the others in size that it influenced the witnesses to select it." Moreover, says Dufault, by conducting a photographic array instead of a lineup, the police deprived the witnesses of the opportunity to assess his similarity or dissimilarity to the described physical features of the robber,

---

1. General Laws 1956 (1981 Reenactment) § 13–13–2, art. III(a) states in pertinent part that

   "[w]henever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint."

specifically the rugged build, weight, and height.

Although photographic identifications have been frequently criticized as less reliable than lineups, most courts "have refused to prohibit the use of photographic identification just because the defendant was then in custody." LaFave & Israel, *Criminal Procedure*, § 7.4(e) at 588 (1984). A two-part test for the admissibility of an out-of-court identification was enunciated by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed. 2d 140 (1977). In discussing the *Manson* test, this court in *State v. Pulphus*, 465 A.2d 153, 163 (R.I. 1983), said that the first aspect of the test requires a determination of the question of whether the photographic array was suggestive. If it is, the court must then look to the totality of the circumstances surrounding the identification to assess its reliability. *Id. See also State v. Lambert*, 463 A.2d 1333, 1336 (R.I. 1983).

Although the other photographs in the array were not "look-alikes," the men portrayed generally had similar physical characteristics, specifically wavy or curly dark hair and a moustache and/or a beard, even though the image of Dufault's head was larger than those in the other photographs. Terming the photographic array "very good," the trial justice found that it was not suggestive. In denying Dufault's motion to suppress, he stated that he was "satisfied that nothing improper was done on the part of the [p]olice department."

Even assuming that the photographic array was suggestive, we conclude that the photographic array in question meets the requirements of the second part of the *Manson* test. According to the *Manson* court, the "corrupting effect of [a] suggestive identification" is to be weighed against the following factors: (1) the opportunity to view, (2) the degree of attention of the witnesses, (3) the accuracy of description, (4) the witness' level of certainty, and (5) the time between the crime and the confrontation. *Manson*, 432 U.S. at 114–16, 97 S.Ct. at 2253–54, 53 L.Ed.2d at 154–55 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed. at 401, 411 (1972)). *See State v. Parker*, 472 A.2d 1206, 1209–10 (R.I. 1984).

An application of these factors to the instant case shows

1. That at least four of the eyewitnesses viewed the robber for approximately two or three minutes, under good lighting conditions, at a relatively close distance and with an unobstructed view.

2. That the witnesses testified that there were no other people in the store at the time. Each of them also stated that he or she was frightened. It seems reasonable that each witness would then watch the robber attentively.

3. That a comparison of the witnesses' descriptions of the robber shows that their descriptions did not substantially differ. One witness described the man as "medium build, about 5'8", 170 lbs [with] Black, wavy hair" and a mustache and beard, wearing a white T-shirt, black vest, and jeans. The store clerk described the man as "kind of chubby," in his twenties with brown curly hair.

4. That each of the witnesses except one positively identified Dufault as the man who robbed the Dairy Mart. One witness picked out the wrong photograph when shown the pictures at the police station. When questioned by the state, she agreed that she did not get a "good look" at the robber because she was standing behind another witness. However, another eyewitness testified that he had seen Dufault on several occasions at Slater Park in Pawtucket prior to the date of the robbery.

5. That the out-of-court identifications occurred approximately one day after the robbery.

The *Manson* criteria being satisfied, the trial justice's denial of Dufault's motion to suppress the out-of-court identification was proper.

In his third issue on appeal Dufault claims that the trial justice abused his discretion in refusing to preclude the testimony of Frederick Ghiosis who had allegedly driven Dufault to and from the Dairy Mart. Dufault points out that the state failed to inform him until several days before trial

that Ghiosis's testimony had been negotiated in return for a plea bargain.

This court has often said that "the primary purpose of discovery is to eliminate surprise at trial, reasoning that when the defense is misled into proceeding to trial unprepared, the basic precepts of due process are violated." *State v. Lionberg*, 533 A.2d 1172, 1180 (R.I. 1987). *See also State v. Concannon*, 457 A.2d 1350, 1353 (R.I. 1983). In assessing whether a defendant was prejudiced by a discovery violation, "the trial justice must determine whether the discovery violation prevented the defendant from properly preparing for trial." *State v. Coelho*, 454 A.2d 241, 245 (R.I. 1982).

■ Dufault's request for rewards, inducements and promises was not made pursuant to Rule 16(a) of the Superior Court Rules of Criminal Procedure. Instead, the request was made pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which, according to Dufault, complements Rule 16 discovery by requiring disclosure of all exculpatory information. We do not need to discuss the merits of this contention because we conclude that the trial justice did not abuse his discretion in denying Dufault's motion for sanctions. At least seven days before trial the state provided Dufault with the information that Ghiosis had negotiated a plea bargain in exchange for his testimony against him. In fact, the record reveals that Dufault used this information to impeach Ghiosis at trial. Accordingly, it appears that Dufault was neither surprised nor unprepared at trial. This court has often said that "the trial justice is in the best position to determine whether any harm has resulted from noncompliance with discovery motions * * *." *State v. Coelho*, 454 A.2d at 244–45. Thus, his or her ruling in that regard should not be overturned absent a clear abuse of discretion. *Id.*

Finally Dufault contends that the evidence presented at trial "raised a strong probability" that the robbery was committed by Ghiosis, not by him. As Dufault points out, the jury had the opportunity to observe both Ghiosis and him. However, as the trial justice aptly observed in his denial of Dufault's new-trial motion, the jury chose to believe that Dufault was the person who had committed the crime.

■ In ruling on a new-trial motion, the trial justice must independently weigh the evidence and assess the credibility of each witness. *State v. Pittman*, 516 A.2d 882, 883 (R.I. 1986). " 'If he [or she] determines that the evidence is sufficient for a jury to conclude that guilt exists beyond a reasonable doubt,' " denial of the new-trial motion is proper. *Id.* Here the trial justice reviewed the testimony of the eyewitnesses and found that there was sufficient evidence to establish Dufault as the person who robbed the Dairy Mart. He concluded that the verdict responded to the law and to the evidence.

For the reasons stated in this opinion, Dufault's appeal is denied and dismissed and the judgment appealed from is affirmed.