**STATE**

v.

**Alfredo PELLICCIA.**

No. 89–234–C.A.

Supreme Court of Rhode Island.

April 24, 1990.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Caroline Cole Cornwell, Sp. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before us on appeal by the defendant, Alfredo Pelliccia (Pelliccia), from a judgment of conviction in Superior Court on one count of assault with intent to murder and one count of assault with a dangerous weapon. We affirm the trial court and deny the defendant's appeal.

On February 13, 1985, at approximately 10 p.m. the Providence police department responded to a shooting incident on Europe Street in Providence. When they arrived at the scene, they found David Hall with multiple gunshot wounds and George Hall, his brother, with a gunshot wound to the arm. Although the police could not get a statement from the barely conscious David Hall, they did receive a statement from George Hall. He told the police that "a male subject had approached him in a white station wagon and asked him if his brother was home and if so, would he go in the house and get him to come outside." When David Hall did come out of the house, the person in the car began shooting at him. In the process George was also hit by a bullet. George Hall further gave the police a brief, vague description of the vehicle and the driver (a white station wagon driven by a white male). No written statement was obtained from George Hall at that point. The police broadcast contained this description as well as a possible name of the suspect, which had been given to the police by Julia Hall, David Hall's wife.

George Hall testified at trial that on the night in question he was visiting his brother at his home at 18 Europe Street. At approximately 10 p.m. a white station wagon pulled up, and George Hall went outside and approached the car. He talked to the man in the car for about a minute.[1] As he started going back into the house, he said, his brother walked out and the man started firing at him. David Hall testified that he left the house because he was wondering to whom his brother was talking and what was taking him so long. His recollection was that his brother had been outside for about five or ten minutes. David Hall was shot in the stomach, the chest, the side, the arm, and the hand and was taken to Rhode Island Hospital. George Hall was shot in the elbow and was taken to St. Joseph Hospital.

George Hall stated that not only had he never seen the man in the car before but the man apparently had not known who George was either. On direct examination he testified that he described the man to the police that night as having black hair and being in his fifties. On cross-examination George Hall was not totally sure he had given the police this description on the night of the incident (the police report had no record of it, but one of the policemen testified that he remembered that George Hall had told him the attacker was an older man, although he did not put this in his report). He thought he may have given the police the information the next day instead, when they came to see him in the hospital to show him a photographic array. He also stated that the lighting conditions on the night in question were fair since there was a streetlight in front of the house and some light was coming from the windows of the house.

On February 14, 1985, two detectives came to St. Joseph Hospital to show George Hall six photographs and asked him if he recognized in them the man who had shot him and his brother. George Hall picked out defendant, Alfredo Pelliccia, immediately. He was "one hundred percent" sure that this was the man because he would "never forget that face." Detective Martin F. Hames, the chief investigating officer on the case, testified that the police did nothing to single out defendant's picture. The photographs were presented at the same time in the same manner. The detective did not remember asking George Hall for any further descriptive information at the hospital. He said he did not ask for any other description because when he put together the array of photographs, he was satisfied that Alfredo Pelliccia was the prime suspect. The rest of the photographs were picked to appear to look like Pelliccia. All photographs represented older white males with mustaches (some heavier than others).

Pelliccia had become a suspect when the police learned from Julia Hall on February

---

1. We note that at the suppression hearing on February 24, 1988, George Hall testified that he had only talked to the man for about two seconds. On cross-examination he stated that his memory was not clear on how long he had talked to the man in the car but that he had had a brief conversation with him.

13, 1985, right after the shooting, that defendant was responsible for the shooting. Detective John McAndrew testified that he knew Pelliccia from the time that he had a lunch wagon in Kennedy Plaza. He said that prior to the night of the police broadcast regarding the shooting, he had seen Pelliccia driving around on a couple of occasions but only remembered that he had been driving a large, light-colored car that looked like a station wagon. When the detective responded to the scene, he noticed a large white station wagon at the corner of Althea and Union Streets that seemed to fit the broadcast description. It also looked like the car he had seen Pelliccia driving on other occasions. He believed that the car had just been parked there because when he touched the hood, it felt moderately warm and the skin on an ice puddle in front of the car had recently been broken.

Detective Paul Crevier took photographs of the car discovered by Detective McAndrew. He observed an empty shell casing on the front seat. The detective searched the interior of the car and found two additional shell casings. He seized the shell casings and held them for evidence. He also retrieved a metal bullet fragment from the staff at Rhode Island Hospital, which fragment had been taken from David Hall. The detective could not say whether the bullet had come from the found cartridge casings because he had not had them looked at by a lab. To the best of his knowledge, a projectile could not be matched to the shell casing alone but had to be matched to the weapon it came from. Since no weapon was ever found, there was no way to trace the bullet to a particular gun. Pelliccia's fingerprints were not found on the car, and the car was registered to Michael Pelliccia, defendant's son.

On February 26, 1988, the jury returned a verdict finding defendant guilty of one count of assault with intent to murder David Hall. The jury did not find defendant guilty of assault with intent to murder David's brother, George Hall, but did find him guilty of the lesser included offense, assault with a dangerous weapon. The

defendant's motion for a new trial was denied on May 13, 1988. On July 14, 1988, defendant was sentenced to twenty years on the first count, ten years to serve and ten suspended, and ten years on the second count to run concurrently with the sentence imposed in count 1. The defendant filed a notice of appeal with this court on July 18, 1988.

I

■■■ The first issue that we consider is whether the trial justice erred in refusing to suppress the pretrial identification of defendant by George Hall. The defendant's motion to suppress the identification was heard on February 24, 1988. At the hearing the trial justice concluded that "certainly there was nothing suggestive about the [photographic] line-up." We agree and are of the opinion that the trial justice correctly denied defendant's motion to suppress the pretrial identification.

As we pointed out in *State v. Barnes*, 559 A.2d 136, 140 (R.I.1989), "[t]he law in this jurisdiction relating to the admissibility of an out-of-court identification is well settled." Under the two-prong test promulgated by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), we must first determine whether the photographic array was unnecessarily suggestive. If we find that the array was impermissibly suggestive, we must then examine the totality of the circumstances to assess the independent reliability of the identification. *Barnes*, 559 A.2d at 140 (citing *State v. Pulphus*, 465 A.2d 153, 163 (R.I.1983), and *State v. Dufault*, 540 A.2d 355, 357 (R.I.1988)).

To determine "whether a photographic array is susceptible of suggestive misidentification, we compare the physical characteristics of each individual featured in the display to the general description of the suspect given to the police by the victim." *Barnes*, 559 A.2d at 140. The subjects in the photographs need not look exactly alike, but they must possess the same general characteristics. *Id.; see also Dufault*, 540 A.2d at 357. At the hearing the detec-

tive who put the array together testified that he did nothing to single out a particular picture. He put Pelliccia's photograph in the array because a statement from Julia Hall named him as a possible suspect. We have reviewed the photographs at issue and conclude that the array is not suggestive. The photographs depict the individuals from the shoulders up, and all individuals appear to be older white males with the same general characteristics. Although George Hall did not mention to the police that the man he saw in the car had a mustache, the police only included photographs of men with mustaches in the array when they discovered that the named suspect, Pelliccia, had a mustache. The array they put together, therefore, was entirely appropriate and not susceptible of suggestive misidentification.

■ Since we hold that the array was *not impermissibly suggestive, we need not reach the second prong of the Manson test wherein we assess the independent reliability of the identification through an examination of the totality of the circumstances. We would like to point out, though, that although George Hall did not give a detailed description of Pelliccia to the police before he was taken to the hospital on the night of the shooting, his positive identification of Pelliccia the next day from his hospital bed was independently reliable. Manson specifies the following factors, as set out in Neil v. Biggers, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972), for determining the totality of the circumstances surrounding the identification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Manson, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. George Hall's identification in the instant case was corroborated by such factors as: (1) he had sufficient opportunity to view Pelliccia right before the shooting and in adequate light since he had a short conversation with him standing at the window of Pelliccia's* car, (2) he looked him straight in the face and paid close attention to him because he said he was curious to know who this man was who wanted to see his brother, (3) he immediately picked out Pelliccia's photograph in the array and was absolutely sure it was the man who shot him and his brother because he would "never forget that face," and (4) the photographic array was shown to him in the hospital the next day, when the incident was still fresh in his mind. With regard to the accuracy of George Hall's description of Pelliccia given to the police on the night of the incident, we realize that it was not detailed and expansive, but it did fit Pelliccia's general description: he was, in fact, an older white male. In addition an in depth description could hardly be expected in the circumstances. He was bleeding, and the police described him as "upset, nervous [and] hysterical."

For these reasons we conclude that the trial justice properly denied defendant's motion to suppress the pretrial identification.

## II

The second issue we examine is whether the trial justice's instruction, given to the jury at the end of the state's closing argument, was adequate to cure certain errors in the form of improper comments made by the prosecutor during the trial. The defendant's argument centers primarily on a series of questions wherein the prosecutor repeatedly tried to link Pelliccia to the car containing the shell casings seized on the night of the shooting. The defendant asked for and received a curative instruction after the prosecutor's closing argument. The prosecutor had remarked in his closing that "George [Hall] knows, the police know and now you know who shot him and his brother." The judge asked the jury to disregard the remark:

"I would also like to caution you during his final argument, [the prosecutor] made a comment concerning the knowledge of the police as to who the shooter was. Obviously, that is your function,

your re[a]lm. You are the ones who determine whether or not this defendant is guilty or not guilty of these charges. So, I ask you to disregard that comment."

In his argument defendant refers to two irregularities during trial that he alleges prejudiced defendant and jeopardized his right to a fair trial. The first instance occurred when it was established that the car was registered to Pelliccia's son, Michael. The prosecutor subsequently asked, "Thank you, Detective. And to the best of your information, the car was used by Alfredo Pelliccia?" The defendant objected and asked for a cautionary instruction. The court sustained the objection, and the jury was asked to disregard the question.

The second instance that defendant singles out occurred when the prosecutor questioned Detective McAndrew whether he was familiar with the car that defendant drove. The detective stated that he had seen defendant driving around but was familiar neither with the vehicle nor with its make, model, or license plate. Upon being asked again by the prosecutor what the car looked like, he testified that he thought it was a light-colored large car, maybe a station wagon. The defendant did not object to this sequence of questions at trial but claims now that the officer was allowed to "transform his testimony from nothingness into highly incriminatory evidence."

The defendant further argues that these two irregularities, compounded by the prosecutor's prejudicial remark in closing argument, made it possible for the jury to conclude that the police had in fact seen defendant driving the vehicle in which the shell casings were found. He also claims that the prosecutor's comment in his closing argument had the effect of "vouching" and was improper. *See State v. Chakouian*, 537 A.2d 409 (R.I.1988).[2]

We disagree with defendant's arguments and find that the trial justice's instructions in this case were adequate to counter any prejudicial effect of the prosecutor's state-

ments. We would also like to point out that there were no objections to the trial justice's original instructions on the part of defendant at the time of the trial. Also defendant did not object at trial to the line of questioning regarding the seized car. He now claims that this was an irregularity and constituted reversible error. A failure immediately to request a cautionary instruction at trial will be fatal to a defendant on appeal. *State v. Turner*, 561 A.2d 869, 873 (R.I.1989) (citing *State v. LaPointe*, 525 A.2d 913, 914–15 (R.I.1987)).

We said in *State v. DeCiantis*, 501 A.2d 365 (R.I.1985), that "[t]his court will disturb a ruling by the trial court 'only if we are convinced that the cautionary instructions were untimely or ineffective, or if the improper material had been so indelibly etched in the jurors' minds that, despite timely action, the trial justice did not disabuse the jurors' minds of the prejudicial effect.'" *Id.* at 367–68 (quoting *State v. Marrapese*, 116 R.I. 1, 7, 351 A.2d 95, 98 (1976)). In *DeCiantis* we considered whether a witness's outbursts and unresponsive answers mentioning organized crime in a trial that was unrelated to alleged organized-crime activities was so prejudicial that the case must be passed. The defendant in that case contended that the witness's testimony was so inherently prejudicial that even the most prudent curative instruction could not rectify the harm. We held that the trial justice had correctly denied the defendant's motion to pass the case because he granted motions to strike at all relevant times and admonished the jury to disregard the improper statements. *DeCiantis*, 501 A.2d at 368. We believe that in the instant case the jury was able to comply with the trial justice's directions to disregard improper remarks on the part of the prosecutor as well.

In the *DeCiantis* case we carefully evaluated the evidence as a whole in reaching our conclusion that no prejudicial harm was done to the defendant. In the instant case, we conclude that in view of the other evi-

---

**2.** In *State v. Chakouian*, 537 A.2d 409, 412 (R.I. 1988), we explained that vouching occurs when the prosecutor says or insinuates that he or she

has "special knowledge" that his or her witness is testifying truthfully.

dence presented to the jury the trial justice's instructions were adequate to counter any prejudicial effect of the prosecutor's statements. If any error was committed, it was harmless.

In addition we do not believe that a compounded error necessarily occurred because of the prosecutor's statement in his closing argument. There was no evidence of a direct connection between the prosecutor's statement about the police's "knowledge" in his closing argument and the police detective's testimony linking defendant to the seized car.

### III

The final issue we consider is whether the trial justice committed reversible error in denying defendant's motion for a new trial. The defendant contends that his conviction is based not on circumstantial evidence but rather on a combination of fragile inferences and improper speculation.

■ "[A] trial justice's ruling on a motion for a new trial is entitled to great weight and will be disturbed only when the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Dame*, 560 A.2d 330, 332–33 (R.I.1989) (citing *State v. Henshaw*, 557 A.2d 1204, 1207–08 (R.I.1989)). In ruling on a motion for a new trial, the trial justice must consider all material evidence in light of the charge to the jury; and using his independent judgment, he must pass upon the weight and credibility of the evidence. "The trial justice must then determine whether the evidence presented a controversy upon which reasonable minds could differ or whether the evidence failed to prove guilt beyond a reasonable doubt." *Dame*, 560 A.2d at 333.

■ It is clear to us that this case turns on the question of George Hall's credibility since his identification of defendant was the strongest element in this case. Neither David Hall nor anyone else in the house saw the man who did the shooting. The evidence linking defendant to the seized car was tenuous at best, and there was no evidence that the bullet fragment taken from David Hall at the hospital matched the shell casings found in the car. We emphasize, though, that the assessment of a witness's credibility is "an issue to be resolved exclusively by the jury within the four walls of the jury room." *State v. Brash*, 512 A.2d 1375, 1381 (R.I.1986); *see also State v. Chakouian*, 537 A.2d at 414. The trial justice concluded in denying defendant's motion for a new trial that although reasonable minds could differ, he was satisfied "that the jury's verdict did, in fact, respond to the law and the evidence." He stated that "[t]here was sufficient evidence, if believed by the jury to convict this defendant of both of these offenses. It really boils down to a matter of credibility."

We believe that the trial justice was correct in his ruling and find no reason to disturb his decision.

For the aforementioned reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in this case are remanded to Superior Court.