**Supreme Court**

No. 2010-345-C.A.

(P1/02-2571 AG)

State                    :

    v.                   :

Charles Pona.            :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State               :

v.              :

Charles Pona.      :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  She was jumping rope in front of her house.  It was an early evening in May when an armed gunman in a hooded sweatshirt approached her in front of 95 Congress Avenue in Providence.  He shot her several times at close range.  She was rushed to Rhode Island Hospital, where she died the next day from multiple gunshot wounds to her head and neck.  She was an eyewitness to the murder of Hector Feliciano (Feliciano), and she was under subpoena to testify in a murder trial that was scheduled to commence the next day.  Her name was Jennifer Rivera (Jennifer).  She was fifteen years of age.  Jennifer was killed in order to prevent her from testifying against Charles Pona (Pona or defendant),[1] the defendant in this case, who was charged with and awaiting trial on the Feliciano murder.[2]  In the course of the ensuing police investigation, three individuals—the defendant, Dennard Walker (Walker), the

---

[1] Throughout the record, defendant also is referred to as "Manny."

[2] The defendant subsequently was convicted of the first-degree murder of Feliciano and other offenses related to that murder.  State v. Pona, 926 A.2d 592, 596, 599 (R.I. 2007).  A full recitation of the circumstances of the Feliciano murder is contained in our opinion affirming that conviction.  Id. at 596-99.

defendant's half-brother,[3] and Miguel Perez (Perez)—were discovered to have planned and participated in Jennifer's murder.[4]

The defendant appeals from a judgment of conviction for first-degree murder, conspiracy, obstruction of justice, and numerous firearms counts. On appeal, defendant assigns a plethora of error: (1) the trial justice abused his discretion in admitting various items of evidence, including evidence that defendant committed the Feliciano murder; (2) the trial justice's jury instructions on evaluating witness credibility were insufficient because they failed to highlight the danger of the testimony of accomplice witnesses who cooperate with the state; (3) the trial justice erred in rejecting defendant's Batson[5] challenge to the state's use of a peremptory challenge; (4) the trial justice impermissibly permitted the state to vouch for the truthfulness of two of its witnesses; and, finally, (5) the trial justice erred in denying defendant's motion for a new trial. We affirm the judgment.

**Facts and Travel**

The events that precipitated this tragic crime began on August 28, 1999, when defendant shot and killed seventeen-year-old Feliciano in the vicinity of Congress Avenue in Providence. Providence police detective-sergeant James Marsland (Det. Marsland) was the lead detective on the Feliciano-murder investigation. Detective Marsland identified Jennifer as an important

---

[3] The record refers to Walker both as defendant's half-brother and his brother.

[4] Both Walker and Perez pleaded guilty to the murder of Jennifer, along with other charges stemming from that murder. Walker, the undisputed triggerman in Jennifer's murder, received a sentence of life imprisonment.

[5] In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the United States Supreme Court held that "the Equal Protection Clause [of the Fourteenth Amendment] forbids [a] prosecutor to challenge potential jurors solely on account of their race * * *." The Batson Court articulated a three-pronged framework for analyzing a criminal defendant's objection to a prosecutor's exercise of a peremptory challenge on this ground, id. at 96-98, which is discussed infra.

witness to this homicide, and he obtained a formal statement from her. She identified defendant from a photo array; she was the sole eyewitness. Based on his investigation, Det. Marsland drafted a warrant for defendant's arrest, and Jennifer testified at defendant's bail hearing.

During her testimony at the bail hearing, with defendant and Perez present, Jennifer disclosed her home address—95 Congress Avenue—and testified that she was home on the night of the Feliciano murder and that she heard gunshots, looked out the window, and saw a lone gunman, whom she later identified as defendant, flee the scene. Although defendant initially was ordered held without bail, he subsequently would be released. He was indicted for Feliciano's murder, and the trial was slated to begin on May 22, 2000. Jennifer was listed as a prosecution witness and was under subpoena to appear and testify.

While incarcerated at the Adult Correctional Institutions (ACI) awaiting trial on the Feliciano murder, defendant shared a cell with inmate Dennis Fullen (Fullen), who later testified against him. The record reveals that defendant and Fullen occasionally would discuss the Feliciano murder. Although defendant mentioned possibly paying Jennifer to refrain from testifying against him, he also told Fullen "that he had to dump her" and "that he wanted to get rid of her." The defendant explained that he wanted Walker and Perez to kill Jennifer, and he expressed anger that Walker had been unable and Perez seemed unwilling to comply. Additionally, defendant expressed his hope for release on bail, so that he could "make sure it got done right."

During this pretrial confinement, Perez visited defendant; during these visits, they would discuss defendant's upcoming murder trial, and Jennifer in particular. The defendant explained to Perez that Jennifer "has got to go" and that Walker "need[ed] to handle that." These admonitions were not ignored; on one occasion, upon observing Jennifer walking down a street,

Perez exited his vehicle and fired his gun in the air in an effort to intimidate her. When Perez related this encounter to defendant, however, he told defendant that he had been attempting to kill Jennifer, but that the gun had jammed. An angry defendant characterized this effort as "dumb" because it potentially alerted Jennifer that she was in danger. The defendant eventually was released on bail on April 22, 2000, one month before Jennifer was killed.

In the early afternoon of May 21, 2000, defendant, Walker, and another friend drove to Lockwood Plaza, where they met Perez. The defendant told Perez that Jennifer was outside of her house. Walker displayed a weapon, and defendant asked Perez if he had a vehicle they could use. Later that day, after Perez secured a vehicle, he drove defendant and Walker to the vicinity of Congress Avenue, where Jennifer lived. As Perez drove by Jennifer's house, defendant and Walker spotted Jennifer. At that point, Perez turned the vehicle onto a series of side streets in order to pass by Congress Avenue once more. When the vehicle made its way back to Congress Avenue, Perez saw Jennifer jumping rope with a group of girls. Perez stopped on a nearby street, and Walker exited the vehicle. The defendant told Walker, "[M]ake sure you do it right." Walker responded, "I can't let you do life[.]"

Walker then made his way to 95 Congress Avenue; he walked up to Jennifer and shot her multiple times at close range.[6] Shortly after hearing gunfire, Perez saw Walker return to the vehicle and heard him declare, "I got her." Jennifer was rushed to Rhode Island Hospital, where she died from multiple gunshot wounds the next day—which would have been the first day of defendant's trial for the Feliciano murder. The trial did not go forward as scheduled.

---

[6] Walker testified that he shot Jennifer "[p]robably like four times." Perez testified that he heard three gunshots. Elizabeth Laposata, M.D. (Dr. Laposata), the state's chief medical examiner at the time of Jennifer's murder, performed the autopsy. Doctor Laposata determined that Jennifer suffered two gunshot wounds, one to the back of the head and one to the neck.

Detective-sergeant Vincent Mansolillo (Det. Mansolillo) oversaw the investigation of this homicide. Apparently, Perez had been arrested on unrelated drug charges, and Det. Mansolillo took the opportunity to discuss Jennifer's murder. At first, Perez was untruthful and unresponsive, but eventually he admitted his participation and implicated Walker and defendant. During the course of the investigation, a search of Perez's prison cell at the ACI, pursuant to a warrant, produced an incriminating letter addressed to Perez and penned by Pona.

Detective Mansolillo also met with inmate Fullen, who was then sharing a prison cell with Walker, who was in jail on an unrelated robbery charge. After giving a recorded statement, Fullen agreed to allow a recording device to be planted in his cell to record his conversations with Walker. During one conversation, Fullen and Walker discussed the circumstances of Jennifer's murder. Walker disclosed that he was with defendant and Perez on the day of the murder and that defendant told Walker to kill her. Walker admitted that he shot Jennifer three times.

The defendant was indicted on August 30, 2002 for numerous offenses arising from the murder of Jennifer Rivera, including murder (count 1), conspiracy to commit murder (count 2), carrying a handgun without a license (count 3), committing a crime of violence while armed with a firearm (count 4), and obstruction of justice (count 5). The defendant was found guilty on all counts, but this Court vacated the conviction and remanded the case for a new trial. State v. Pona, 948 A.2d 941, 943, 954 (R.I. 2008) (Pona I).

Before defendant's retrial in April 2010, several pretrial motions were litigated. First, defendant moved to exclude evidence of the cooperation agreements that Perez and Fullen had entered into with prosecuting authorities. Although the trial justice denied defendant's motion and allowed the agreements as full exhibits, portions of them were redacted in a manner that was

agreeable to the parties. Second, defendant requested a jury instruction relative to the credibility of accomplices and cooperating witnesses who testify for the state. The trial justice denied defendant's request, explaining that the requested instruction was not required under this Court's established caselaw.

Third, although the state agreed to redact portions of defendant's letter to Perez, defendant requested that more of the letter be redacted.[7] Defense counsel argued that the language was irrelevant and highly prejudicial, in that it implied that defendant was incarcerated somewhere outside Rhode Island and that the detectives assigned to his case disbelieved his declarations denying any involvement in Jennifer's murder. The state argued that the challenged portion of the letter was probative of defendant's guilty state of mind and reflected the overall tenor of the entire letter: cautioning Perez not to divulge any information about Jennifer's murder. The trial justice denied defendant's request for further redactions, noting that, in his opinion, that portion of the letter was "very vanilla," did not imply that defendant was imprisoned elsewhere, and was probative for the reasons articulated by the state.

The defendant also vigorously sought to exclude any reference to the Feliciano murder. The defendant argued that proof of a motive was not an essential element of the charges against him and that evidence of the Feliciano murder was therefore inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence. The state responded that much of the evidence that this

---

[7] Specifically, defendant requested that the following passage of the letter be excised:

> "Yo[,] these [d]etectives try to come down here and see me[,] talking about they know I was there when that broad got hit. I was like[, 'Y]o, I don[']t know nothing[.] [I]f you got so much[,] why you questioning me about it[?'] They was like[, 'C]ome on[, M]anny[,] you know something[.'] I was like[, 'Y]ou came all the way down here for nothing. Whatever is whatever. If you so call [sic] got a case[,] see me in Court[. O]ther [than] that[,] I don't have nothing else to say[.' T]hey was saying mad shit[.]"

Court deemed overly prejudicial in Pona I would not be introduced, but it added that this Court acknowledged in Pona I that some evidence of the Feliciano murder was permissible in defendant's retrial. See Pona I, 948 A.2d at 952 n.14 ("The prosecutor is not prevented from presenting facts in his case-in-chief that are undisputed, including how Jennifer became involved in the first case and the gruesome manner of her death."); id. at 953 ("[W]e will not go so far as to deny the prosecution the opportunity to make any reference to the fact that defendant was charged with murder * * *.").

The trial justice agreed with the state and held that the evidence of the Feliciano murder would not be excluded in its entirety because it was relevant to show motive and defendant's specific intent to have Jennifer killed. After carefully chronicling our decision in Pona I, the trial justice permitted evidence that Jennifer emerged as the key witness in the Feliciano-murder investigation; that she testified at defendant's bail hearing and identified him as the man she saw fleeing from the murder scene; and that she was under subpoena to testify at the upcoming trial on the day she was killed. At the same time, however, the trial justice ruled that the tape of the bail hearing would not be played for the jury and that the state could not introduce certain physical evidence from the Feliciano murder—namely, the pager and fingerprints that this Court found objectionable in Pona I. See Pona I, 948 A.2d at 943, 950-52.

During jury selection, the state exercised a peremptory challenge to excuse Juror 156, a prospective juror of Hispanic descent. In the course of the voir dire, the prosecutor informed the trial justice and defense counsel that he previously had prosecuted Juror 156's cousin and that the trial justice had presided over those proceedings. Although the juror stated that he and his cousin do not speak and indicated that he could be fair to defendant and had no hesitation about sitting as a juror in this case, the prosecutor, at a sidebar conference, expressed his belief that the

juror should be excused. However, while acknowledging the prosecutor's concerns, the trial justice declined to excuse the juror for cause. The state then exercised a peremptory challenge to excuse Juror 156, and defendant raised a <u>Batson</u> argument in response. The trial justice noted that the juror was of Hispanic descent, and he inquired of the prosecutor whether he had a race-neutral reason for the strike. The prosecutor submitted that he exercised a peremptory challenge because, fifteen years earlier, he had prosecuted the juror's cousin. The trial justice agreed that the prosecutor had a "completely plausible, credible and rational" race-neutral reason for the strike, and he accordingly overruled defendant's <u>Batson</u> challenge.

In his opening statement, the prosecutor recounted the murder of Feliciano and the ensuing police investigation; he also described how Jennifer came to be the key eyewitness after identifying Pona as the perpetrator. The defendant renewed his Rule 404(b) objection to the evidence referenced in the prosecutor's opening statement, requested a cautionary instruction, and moved to pass the case. The trial justice denied the motion to pass, but he instructed the jury that, although they would hear evidence about the Feliciano murder and that defendant had been indicted for that crime, he was not on trial for that murder and that the jury could only consider this evidence for the limited purpose of showing defendant's intent, plan, or motive to kill Jennifer.

In the state's case-in-chief, Det. Marsland testified, over objection, that he drafted the warrant for defendant's arrest on the Feliciano murder; that defendant was arrested for that murder; that Jennifer testified at his bail hearing in connection with the Feliciano case; and that she had identified defendant as the perpetrator. At the conclusion of the state's direct examination of Det. Marsland, the trial justice reminded the jury that defendant was not on trial

for the Feliciano murder and that the Feliciano evidence was offered only for the limited purpose of showing defendant's intent, plan, or motive to kill Jennifer.

Stephen Mokler (Mokler), a former investigator in the Special Investigations Unit at the ACI, also testified for the state. During cross-examination, defense counsel asked Mokler whether Fullen had "serious enemy issues" at the ACI, necessitating a transfer to the High Security Segregation Unit; Mokler responded in the affirmative. On redirect examination, Mokler testified, this time over defendant's objection, that Fullen had been transferred to protective custody and that this transfer was related to Fullen's "enemy issues." The defendant moved to pass the case, arguing that evidence that Fullen was in protective custody was highly prejudicial because it implied that the witness needed protection from defendant. The trial justice denied the motion, explaining that "[t]he record is clear from this witness that the purpose of sending Fullen to protective custody was to deal with the enemy issues that [Mokler] had testified to in the first instance."

For his part, Fullen testified about his discussions with defendant when the two were cellmates, and his cooperation agreement was introduced over defendant's objection. Significantly, the trial justice instructed the jury that the cooperation agreement was not being "offered as substantive evidence that Mr. Fullen is, or has, or will testify truthful[ly] in this case."

Perez also testified at length for the state. Again over defendant's objection, the state introduced, as a full exhibit, the cooperation agreement between Perez and the state. The trial justice instructed the jury that the cooperation agreement was not being offered as substantive evidence that Perez had or would testify truthfully. Over defendant's objection, Perez testified that he named defendant as a co-conspirator when he pled guilty to Jennifer's murder. At that

point, the trial justice reminded the jury that Perez had pled guilty to the crimes for which defendant was now on trial, but that fact was not substantive evidence of defendant's guilt and was only being offered for the limited purpose of assessing Perez's credibility. Additionally, Perez testified, over objection, that he remembered when defendant was arrested for the Feliciano murder and that he was present at defendant's bail hearing when Jennifer testified. The trial justice reminded the jury, yet again, that evidence of the Feliciano murder was being offered for the very limited purpose of showing defendant's intent, plan, or motive to kill Jennifer.

Perez also provided graphic testimony concerning the events leading up to Jennifer's murder. According to Perez, on May 21, 2000, before going to Jennifer's house, the group talked about exacting retribution from a member of the Lassiter family for the death of one of their friends a month earlier. Perez told the jury that Walker declared that "[h]e wanted to get one of [the Lassiters]." The witness was permitted to testify, over defendant's objection, that Walker wanted "[t]o retaliate for what [the Lassiters] did to our friend." When the prosecutor asked Perez what had happened to the friend, the trial justice sustained defendant's objection and instructed the prosecutor to pursue another line of inquiry. Later in his testimony, Perez stated that, on May 21, 2000, they planned to "[s]ee if [they] bumped into one of the Lassiters" in the Elmwood Avenue area before heading to Jennifer's house. Perez further testified, without objection, that the group drove to the Elmwood Avenue area, but, finding no Lassiters, proceeded to Jennifer's house on Congress Avenue. Finally, defendant's letter to Perez was admitted, over defendant's objection, as a full exhibit, and the portion of the letter to which defendant had previously objected was read into evidence.[8]

---

[8] That portion is set forth in footnote 7, supra.

The state also called Walker in its case-in-chief; but it readily became apparent that he was a hostile witness.[9] Although admitting that he was the triggerman in Jennifer's murder, Walker relayed a very different version of that murder than what Perez recounted. According to Walker, he was riding in a car by himself just before he murdered Jennifer outside of her home; he testified that he acted alone and never spoke to defendant about his murderous intentions. Walker testified that his statements to Fullen in the recorded conversation—in which he declared that he was with Perez and defendant on the day of the murder—were not accurate. Additionally, although he acknowledged that during his plea colloquy he admitted his guilt and alluded to defendant's participation in the crimes against Jennifer, Walker insisted that the facts that were placed on the record during his plea colloquy were admitted as true only as they related to Walker's involvement in the murder.

At the close of the state's case, defendant's motion for judgment of acquittal on the firearms counts was denied. The defendant renewed his request for a jury instruction concerning the credibility of cooperating witnesses. The trial justice denied this request, but he noted that defendant's objection would be "preserved for purposes of [the] instructions." Although the trial justice did not give the instruction defendant sought, he nevertheless provided the jury with comprehensive instructions for assessing witness credibility, which highlighted the need for the jury to focus on "the interest or lack of interest of the witness, if any, in the outcome of the case, and the bias or the prejudice of the witness, if any, as well as any criminal record that a witness may have." The instructions also informed the jury that it "may consider whether a witness would have a motive to be truthful or untruthful in his or her testimony." The trial justice's final

---

[9] Unlike Perez, Walker had not entered into a cooperation agreement with the state.

- 11 -

charge to the jury also included yet another cautionary instruction on the limited purpose of other-crimes evidence.

During the state's closing argument, the prosecutor reminded the jury about the cooperation agreements of Perez and Fullen, the promises to tell the truth, and the harsh consequences for failure to do so. Specifically, the prosecutor told the jury the following:

> "There's no reason for the police or the Attorney General's Office to want a person to implicate a person who didn't do anything. And that's why the cooperation agreement says if you're caught telling a lie, either if you're questioned by the police, by the Attorney General's Office, by the defense lawyer or by the Court, any party involved, you can get the maximum sentence allowable on your offenses, the agreement is null and void, you can get charged with perjury in addition to the charges you already have.
> "So these cooperation agreements are there for the protection of everyone involved, the defendant, the Court, the State, and the defense. And it shows you exactly what these people [Fullen and Perez] were operating under at the time they provided information. They told the truth and they received a reward if they did for their cooperation."

The defendant made no objection to these comments.

The defendant was found guilty on all counts in the indictment. The trial justice denied defendant's motion for a new trial, concluding that the jury's verdict was "wholly justified by the credible evidence in this case." He found the testimony of Fullen and Perez to be "unvarnished and unembellished * * *, in a word, credible." This testimony, he concluded, amply supported the jury verdict. By contrast, the trial justice deemed Walker's testimony to be "perjury," and "pathetic and desperate"; he concluded that "no rational juror charged with the responsibility of judging credibility would or could rely on Walker's specious and inane trial testimony."

The trial justice sentenced defendant to life imprisonment for Jennifer's murder and ten years for conspiracy to commit murder, to be served concurrently. He also sentenced defendant to ten years on count 3, carrying a pistol without a license, to be served consecutive to the

sentences imposed on counts 1 and 4. On count 4, using a firearm during the commission of a crime of violence, the trial justice imposed a ten-year sentence, to be served concurrently with the sentence imposed on count 1. Finally, defendant received a five-year concurrent sentence for obstruction of justice. All sentences imposed in this case were ordered to run consecutive to the life sentence that defendant received for the Feliciano murder. The defendant appeals.

## Issues Presented

The defendant's appellate contentions can be separated into five categories. First, defendant argues that the trial justice abused his discretion in admitting an array of what he asserts was highly prejudicial evidence. Specifically, defendant assigns error to the trial justice's decision to admit: (1) evidence concerning defendant's involvement in the Feliciano murder; (2) evidence that defendant, Perez, and Walker were searching for one or more of the Lassiters before proceeding to Jennifer's house to kill her; (3) a portion of the letter from defendant to Perez that was seized from Perez's ACI cell; and (4) testimony that Fullen was placed in protective custody. Second, defendant urges this Court to adopt a rule requiring trial justices to give a special instruction about accomplice witnesses if requested or, in the alternative, to hold that the trial justice's instructions in this case were insufficient to apprise the jury of the dangers of the testimony of accomplices who cooperate with the state. Third, defendant claims that the trial justice erred in rejecting his Batson challenge to the prosecutor's decision to strike a prospective juror of Hispanic descent. Fourth, defendant contends that the trial justice allowed the state to impermissibly vouch for the truthfulness of Fullen and Perez. Finally, defendant argues that the trial justice erred in denying his motion for a new trial. We address each contention in turn.

- 13 -

**Analysis**

**I**

**Evidentiary Issues**

The defendant argues that the trial justice abused his discretion in failing to exclude, under Rules 403 and 404(b) of the Rhode Island Rules of Evidence, several items of evidence. "[I]t 'is well settled that we review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard.'" State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012) (quoting State v. Marmolejos, 990 A.2d 848, 851 (R.I. 2010)). We will reverse a trial justice's ruling on the admissibility of evidence only where "it constitutes a clear abuse of discretion." Id.; see also State v. Smith, 39 A.3d 669, 673 (R.I. 2012); State v. Dubois, 36 A.3d 191, 199 (R.I. 2012).

Generally, Rule 404(b)[10] "prohibits the use of evidence of prior bad acts, wrongs, or crimes 'to show the defendant's propensity to commit the crime with which he [or she] is currently charged.'" Dubois, 36 A.3d at 199 (quoting State v. John, 881 A.2d 920, 926 (R.I. 2005)); see also State v. Rodriguez, 996 A.2d 145, 150 (R.I. 2010); Pona I, 948 A.2d at 949. This prohibition, however, is not absolute; "[e]vidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like." Dubois, 36 A.3d at 199 (quoting John, 881 A.2d at 926 (internal quotations omitted)); see also Rodriguez, 996 A.2d

_____

[10] Rule 404(b) of the Rhode Island Rules of Evidence provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

at 150-51; <u>Pona I</u>, 948 A.2d at 949-50. "Thus, it is only when evidence of prior crimes, wrongs, or acts is offered to prove that the accused has a criminal disposition and, therefore, is more likely to have committed the crime for which he stands accused, that Rule 404(b) requires its exclusion." <u>Rodriguez</u>, 996 A.2d at 151.

We recognize, of course, that "[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is 'both a fine one to draw and an even more difficult one for judges and juries to follow.'" <u>Rodriguez</u>, 996 A.2d at 150 (quoting <u>State v. Brown</u>, 900 A.2d 1155, 1160 (R.I. 2006)); <u>see also</u> <u>Pona I</u>, 948 A.2d at 950. Nevertheless, "[h]owever difficult the task, the trial justice must exercise his or her sound discretion in fixing that line and deciding whether this type of evidence should be admitted, excluded, or limited." <u>Dubois</u>, 36 A.3d at 200. Additionally, "[t]he trial justice also must balance the relevance of the evidence against its remoteness and the potential for improper prejudicial impact." <u>Id.</u>

Rule 404(b) does not represent the only hurdle a proponent of other-acts evidence must surmount. <u>Pona I</u>, 948 A.2d at 950. Such evidence, like all evidence, must survive Rule 403 scrutiny. <u>State v. Gaspar</u>, 982 A.2d 140, 148 (R.I. 2009); <u>Pona I</u>, 948 A.2d at 950. Rule 403, which "cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence[,]" <u>Gaspar</u>, 982 A.2d at 148, provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403.

However, "a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. * * * It is only when evidence is marginally relevant and enormously prejudicial that a trial

- 15 -

justice must exclude it." Smith, 39 A.3d at 675 (quoting State v. DeJesus, 947 A.2d 873, 883 (R.I. 2008)); see also Brown, 42 A.3d at 1244.

## A. The Feliciano Murder

The defendant's first assignment of evidentiary error must be assessed in light of our decision in Pona I. In defendant's first trial, the state introduced an abundance of evidence concerning defendant's involvement in Feliciano's murder to a degree that amounted to reversible error. Pona I, 948 A.2d at 943, 948-49. Specifically, in Pona I, the jury was shown the photopack from which Jennifer identified defendant as Feliciano's assailant; the jurors learned that defendant's pager was found at the murder scene and that his fingerprints were found inside the vehicle leaving the scene; and they also heard the entire audiotape recording of Jennifer's bail-hearing testimony, which the prosecutor referred to as Jennifer's "voice from the grave." Id. at 943.

In vacating defendant's conviction, this Court concluded that the use of this evidence constituted reversible error. Pona I, 948 A.2d at 949. We explained that "the relevancy of the pager and fingerprints was remote and the relationship to Jennifer's murder remained tenuous." Id. at 951. Instead, "this evidence essentially proved that [defendant] was the murderer of another teenager and was extremely prejudicial," id., because its impact "was to highlight the propensity of [defendant] as a person who had murdered before and who would not hesitate to murder again." Id. at 949. With respect to Jennifer's bail-hearing testimony, we determined that:

> "[T]he Superior Court erred when it did not attempt to strike a balance between the necessity of admission and the danger of unfair prejudice occasioned by the wholesale adoption of the bail-hearing testimony. This type of evidence must be received 'with great caution,' and a careful review of her testimony reveals that there are particular statements that should have been excluded."

- 16 -

Id. at 953 (quoting State v. Peters, 86 R.I. 447, 450, 136 A.2d 620, 621 (1957)).

We cautioned that "references to the murder of Feliciano should have been kept to a minimum." Id.

However, nothing we said in Pona I suggested that all reference to the Feliciano murder was off-limits. By contrast, we recognized that it was "undisputed that Walker killed Jennifer for the sole reason of preventing her from testifying against defendant." Pona I, 948 A.2d at 952 n.14. We declared that "[t]he prosecutor is not prevented from presenting facts in his case-in-chief that are undisputed, including how Jennifer became involved in the first case and the gruesome manner of her death." Id. Similarly, we explained that:

> "[T]here is no question that [Jennifer's] testimony at [defendant's] bail hearing, and the fact that she was to testify when he was tried for murdering Feliciano, led to her being killed. * * * We agree that reference to her testimony was reasonable to demonstrate the event that precipitated her tragic death. * * * Although we will not go so far as to deny the prosecution the opportunity to make any reference to the fact that defendant was charged with murder, we nonetheless hold that the quantum of evidence admitted here was extremely prejudicial to defendant and requires reversal." Id. at 953.

Because it was the quantum of evidence of the Feliciano murder, and not straightforward proof of defendant's involvement in that crime, that this Court declared to be reversible error, proof of defendant's arrest and Jennifer's connection to the prosecution was highly relevant and clearly not off-limits.

In this case, the trial justice ably followed our admonitions in Pona I. The quantum of evidence of the Feliciano murder introduced in the retrial radically was reduced from that in Pona I. The photopack, the pager, and the fingerprint evidence were not admitted. The jury did not hear Jennifer's "voice from the grave." Instead, references to the Feliciano murder

appropriately were minimal. Detective Marsland testified that he was involved in the investigation and that it was Jennifer who identified defendant as the man she saw fleeing the murder scene. He also related that Jennifer testified at defendant's bail hearing—with defendant and Perez in attendance—and that she was under subpoena to testify against defendant at a trial scheduled to commence the day after she was shot. In sum, the trial justice struck the appropriate balance; he allowed evidence of Jennifer's involvement in the Feliciano investigation—which was necessary to understand defendant's motive and intent—and excluded evidence that related solely to the prior murder itself, which had no probative force—save for inviting the jury to engage in propensity-based reasoning to conclude that, because defendant was guilty of killing Feliciano, he had also killed again.[11]

The defendant is not entitled to a sanitized version of the state's evidence against him; he is guaranteed a fair trial. The record demonstrates that the trial justice carefully instructed the jury on four occasions that the evidence of the Feliciano murder was being admitted for the sole purpose of demonstrating defendant's motive, intent, or plan to kill Jennifer. Therefore, in addition to carefully separating the evidence of the Feliciano murder that would be admitted from the evidence that would be excluded, the trial justice safeguarded against the danger that the jury would use this evidence to engage in impermissible propensity-based reasoning.

For these reasons, we conclude that the trial justice did not abuse his discretion in admitting evidence showing defendant's involvement in the Feliciano murder.

---

[11] Before this Court, defendant contends that "the [s]tate and [defendant] could have stipulated that [Jennifer] was going to be a key witness for the [s]tate in an upcoming felony trial, for which he possibly faced a life term." (Emphasis added.) Although the state could have agreed to such a stipulation, it was not required to do so. Moreover, although such a stipulation evidently was offered by defendant in his first trial, State v. Pona, 948 A.2d 941, 944 (R.I. 2008) (Pona I), there is nothing in the record of the retrial that suggests that such a stipulation was offered in this case.

## B. Looking for a Lassiter

The defendant next asserts that the trial justice erred in allowing evidence that defendant, Walker, and Perez first went looking for a member of the Lassiter family, intending to exact retribution for a friend's death, before they proceeded to 95 Congress Avenue to kill Jennifer. The defendant argues that this evidence was irrelevant, needlessly confusing, and highly prejudicial, since it permitted the jury to infer that these men were a murderous bunch. Having carefully reviewed the record, we are satisfied that this issue is not properly before us.

"According to our well settled 'raise or waive' rule, if an issue was not preserved by specific objection at trial, then it may not be considered on appeal." State v. McManus, 990 A.2d 1229, 1237 (R.I. 2010) (emphasis added); see also State v. Jaiman, 850 A.2d 984, 987 (R.I. 2004) ("To preserve an evidentiary issue on appeal, [the] defendant 'was required to show us that he objected specifically to this evidence at trial and that he stated the grounds for his objection.'" quoting State v. Feole, 748 A.2d 239, 243 (R.I. 2000)). We require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it.

At the outset, we note that, without objection, Perez was permitted to testify that, on the day Jennifer was murdered, he, defendant, and Walker discussed "guys that killed one of our friends the month before" and that those "guys" were the Lassiters. The prosecutor then asked, "And what was it about the Lassiters that either you or [Walker] or [defendant] was talking about?" The defendant objected, and the prosecutor offered to rephrase the question. Perez then testified, without objection, that Walker declared that "[h]e wanted to get one of [the Lassiters]." Perez also testified, again without objection, that before going to 95 Congress Avenue, the group went to "[s]ee if [they] bumped into one of the Lassiters[.]" Likewise, Perez testified, without

objection, that he, defendant, and Walker went to a gas station on Elmwood Avenue, did not encounter any Lassiters, and then proceeded to 95 Congress Avenue.

To be sure, defendant posed some objections to this line of inquiry. For example, after Perez stated that Walker "wanted to get one of [the Lassiters]," the prosecutor asked, "How come?" The defendant objected, and the trial justice overruled the objection. Perez answered, "To retaliate for what they did to our friend." After the prosecutor asked Perez what happened to their friend, defendant's objection was sustained. Similarly, when the prosecutor asked Perez about where the group planned to search for a Lassiter, defendant's objection was overruled. Perez then testified that the trio planned to look for the Lassiters at a gas station on Elmwood Avenue.

However, these objections were general in scope; at no point did defendant state the basis for the objection, let alone make an argument centered on Rule 403. Moreover, Perez gave the most critical portions of his testimony about the Lassiters—that the Lassiters had killed one of their friends the month before, that Walker "wanted to get one of them," and that the group actually went looking for the Lassiters—in the absence of any objection.

Additionally, much of the same evidence also was admitted, without objection, during Walker's testimony. Walker acknowledged that he told Fullen that he, defendant, and Perez were "looking for a Lassiter" on the day he murdered Jennifer. Similarly, the prosecutor read for the jury the statement of facts accompanying Walker's guilty plea; these facts included that Walker wanted revenge for the death of one of their friends at the hands of the Lassiters and that, before proceeding to Congress Avenue to kill Jennifer, the group went looking for Kendall Lassiter. Walker testified that, at the time of his plea, he acknowledged in open court that this statement of facts was true. The defendant lodged no objection to any of this testimony.

We are of the opinion that defendant's objections to this evidence, to the extent any were made, were not sufficiently focused to alert the trial justice to a Rule 403 basis for exclusion of the evidence. Coupled with defendant's failure to object to the critical portions of this evidence, defendant's general objections did not preserve his Rule 403 argument for our review. See State v. Feliciano, 901 A.2d 631, 646 (R.I. 2006) ("Even if we were to overlook the temporal insufficiency of defense counsel's objections, the general, rather than specific, character of the objections failed to adequately alert the trial justice to [the] defendant's concern * * *."); State v. Bettencourt, 723 A.2d 1101, 1108 (R.I. 1999) ("[D]efense counsel asserted a general rather than a specific objection at trial; therefore, the objection has not been preserved for appeal.").

### C. Pona's Letter to Perez

The defendant also claims that the trial justice erred in admitting the following portion of his letter to Perez:

> "Yo[,] these [d]etectives try to come down here and see me[,] talking about they know I was there when that broad got hit. I was like[, 'Y]o, I don[']t know nothing[.] [I]f you got so much[,] why you questioning me about it[?'] They was like[, 'C]ome on[, M]anny[,] you know something[.'] I was like[, 'Y]ou came all the way down here for nothing. Whatever is whatever.[']"

The defendant contends that this excerpt was highly prejudicial because: (1) the phrase "you came all the way down here" suggested that defendant was incarcerated outside the state "because he was a dangerous man"; and (2) it related defendant's impression that the detectives did not believe his denials, which would tend to "encourage the jury to base its decision on the

- 21 -

disbelief of the detectives." This danger of unfair prejudice, defendant argues, when coupled with the marginal relevance of this evidence, required exclusion under Rule 403.[12] We disagree.

In denying defendant's motion in limine to exclude this portion of defendant's letter, the trial justice remarked that the evidence was "very vanilla"; he found that the phrase "came all the way down here" just as easily could mean that the detectives needed to travel "all the way down" to the ACI to speak with defendant. We are in full agreement with the trial justice's assessment of the prejudice of this letter. Moreover, contrary to defendant's assertion, this portion of the letter was more than marginally relevant; it conveyed to Perez that he too should not cooperate in the investigation of Jennifer's murder, thereby tending to establish defendant's guilty state of mind. We are satisfied that the trial justice did not abuse his discretion in permitting this evidence to come before the jury.

### D. Fullen in Protective Custody

The final instance of claimed evidentiary error concerns Mokler's testimony that Fullen was placed into protective custody at the ACI. The defendant contends that this evidence tended to suggest that Fullen required protection from defendant and was, therefore, unfairly prejudicial. This contention misses the mark.

The state did not elicit this testimony from Mokler until after defendant opened the door to this topic. It was defense counsel who inquired about Fullen's "serious enemy issues" at the ACI. On redirect examination, Mokler testified that Fullen was transferred to protective custody and that this transfer was related to these same "enemy issues." In denying defendant's motion to pass the case, the trial justice explained that "[t]he record is clear from this witness that the

---

[12] In his reply brief, defendant asserts that, to the extent that the letter relates what the detectives told defendant, it contains inadmissible hearsay. No hearsay argument was made at trial, however, and we will not entertain its debut on appeal.

- 22 -

purpose of sending Fullen to protective custody was to deal with the enemy issues that [Mokler] had testified to in the first instance." We agree with the trial justice that no unfair prejudice flowed from this testimony, and we discern no abuse of discretion in denying the motion to pass and admitting this evidence.

## II

### Accomplice Instruction

The defendant also assails the trial justice's refusal to instruct the jury about the dangers of testimony from accomplices who cooperate with the state. When we are called upon to review "issues pertaining to jury instructions, we do so de novo." State v. Vargas, 991 A.2d 1056, 1060 (R.I. 2010); see also State v. Imbruglia, 913 A.2d 1022, 1031 (R.I. 2007). In conducting this task, we remain mindful that the trial justice's jury "instructions 'need only adequately cover [ ] the law." State v. Sivo, 809 A.2d 481, 488 (R.I. 2002) (quoting State v. Hanes, 783 A.2d 920, 925 (R.I. 2001)); see also State v. Carpio, 43 A.3d 1, 10 (R.I. 2012). We do not simply home in on single sentences in the challenged jury instructions; we instead "examine the challenged portion in the context in which it was delivered to ascertain how a jury composed of ordinary, intelligent lay people would have understood the instructions." Sivo, 809 A.2d at 488; see also Carpio, 43 A.3d at 10. "The trial justice is bound to ensure that the jury charge 'sufficiently addresses the requested instructions and correctly states the applicable law.'" Carpio, 43 A.3d at 10 (quoting State v. Sivo, 925 A.2d 901, 913 (R.I. 2007)).

We repeatedly have held that "it is not necessary for a trial justice to give an accomplice charge." State v. Drew, 919 A.2d 397, 405 (R.I. 2007) (quoting Sivo, 809 A.2d at 491); see also State v. Marrapese, 583 A.2d 537, 545 (R.I. 1990); State v. Mastrofine, 551 A.2d 1174, 1176 (R.I. 1988); State v. Fenner, 503 A.2d 518, 525 (R.I. 1986); State v. DeMasi, 413 A.2d 99, 100

(R.I. 1980). We refrain from thrusting a trial justice into the unfamiliar role of advocate because "[c]ounsel are given adequate opportunities to argue matters of credibility, including bias, motivation, anticipated benefits or rewards." Sivo, 809 A.2d at 491 (quoting Fenner, 503 A.2d at 525). Indeed, "[i]n this jurisdiction judges are inhibited from commenting upon the evidence unless they do so in a completely impartial manner." Id. (quoting Fenner, 503 A.2d at 525). "Thus, '[c]ounsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness.'" Drew, 919 A.2d at 406 (quoting Fenner, 503 A.2d at 525).

The defendant candidly acknowledges this substantial body of caselaw, but he nevertheless entreats us to overrule it. We were confronted with a similar importunity in Drew, 919 A.2d at 405. We rejected that request, noting that "this Court will consider overturning precedent only 'if the motivating purpose is to eliminate inconsistency and anomalous results'" and that "[t]he defendant proffer[ed] no evidence to suggest that the present case undermine[d] our existing law." Id. at 406 (quoting State v. Werner, 865 A.2d 1049, 1056 (R.I. 2005)).

In this case, defendant attempts to portray this issue in a different light. He contends that the trial justice's instructions, unlike the instructions in Drew, Sivo, Fenner, and DeMasi, did not name the cooperating accomplices—Perez in particular—or remind the jury that cooperation with authorities in exchange for promises of leniency may influence such a witness's testimony. According to defendant, the possibility that some trial justices may name the cooperating accomplices in their instructions, while others do not, presents a sufficiently serious inconsistency to warrant overruling our precedent. We are unconvinced.

The trial justice provided the jury with a comprehensive instruction on evaluating witness credibility; it included:

> "You should consider the interest or lack of interest of the witness, if any, in the outcome of the case, and the bias or the prejudice of the witness, if any, as well as any criminal record that a witness may have.
> "You may consider whether a witness would have a motive to be truthful or untruthful in his or her testimony, and you may further consider the probability or the improbability of the truth of a witness's testimony."

The trial justice thus alerted the jury to the possibility that a witness's interest in the case, or his bias or motive to be untruthful may impact that witness's credibility. Our caselaw requires nothing more.

Clearly, the trial justice did not specifically identify Perez or mention the fact of his cooperation agreement with the state during this instruction—nor was he required to do so. By the close of the evidence, the jury hardly could be expected to overlook Perez's testimony. As the crucial witness for the state, Perez offered the most damning of all the testimony about defendant's involvement in Jennifer's murder. Additionally, the state's cooperation agreements with both Fullen and Perez were admitted as full exhibits, and defense counsel extensively cross-examined both witnesses on the promises they received from the state in exchange for their cooperation. Moreover, as our caselaw on this issue envisions, defense counsel vigorously argued during closing argument that the promises Perez and Fullen received in exchange for their testimony should lead the jury to evaluate their credibility with skepticism. Therefore, we are satisfied that defendant's assertion of instructional error is without merit.

### III

### <u>Batson</u> Challenge

The defendant next attacks the state's use of a peremptory challenge to excuse a juror of Hispanic descent. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "guarantees the defendant that the State will not exclude members of his [or

her] race from the jury venire on account of race[.]" State v. Pona, 926 A.2d 592, 601 (R.I. 2007) (quoting Batson v. Kentucky, 476 U.S. 79, 86 (1986)). To determine whether a defendant has been deprived of this guarantee by the state's use of a peremptory challenge, we employ Batson's familiar tripartite test. Id. at 601; State v. Price, 706 A.2d 929, 935 (R.I. 1998). "First, the defendant must 'establish a prima facie case of purposeful discrimination[.]'" Pona, 926 A.2d at 601 (quoting Batson, 476 U.S. at 96 (emphasis added)); see also Price, 706 A.2d at 935. "Upon such a showing, the burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." Price, 706 A.2d at 935; see also Batson, 476 U.S. at 97; Pona, 926 A.2d at 601. Finally, "[t]he trial court is then left to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination." Price, 706 A.2d at 935; see also Batson, 476 U.S. at 98; Pona, 926 A.2d at 601.

We have remarked that the "decisive question" in a Batson inquiry "will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Price, 706 A.2d at 935 (quoting State v. Holley, 604 A.2d 772, 778 (R.I. 1992)). Accordingly, "[t]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference." Id.; see also Snyder v. Louisiana, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."); Batson, 476 U.S. at 98 & n.21; Pona, 926 A.2d at 602.

In this case, we will assume that defendant satisfied Batson's first step. Although the trial justice did not state explicitly whether defendant satisfied this first prong, he noted that the

excused juror was of Hispanic descent,[13] and he inquired of the prosecutor whether a race-neutral reason existed for the strike. The trial justice next proceeded to rule on the ultimate question of discrimination. "[T]hus, 'the preliminary issue of whether [ ] defendant had made a prima facie showing [became] moot.'" Pona, 926 A.2d at 607 (quoting State v. Austin, 642 A.2d 673, 678 (R.I. 1994)). Additionally, there can be little doubt that the prosecutor's articulated reason for the strike—that the prosecutor had prosecuted the juror's cousin fifteen years before defendant's trial—is race-neutral, thereby satisfying Batson's second prong. Therefore, the only contention between the parties on this issue is whether the prosecutor legitimately struck the challenged juror for the stated reason or instead did so on account of the juror's race.

The defendant argues, as he did below, that the fact that the juror stated that he "never" spoke with his cousin, who had been prosecuted by the prosecutor, demonstrates that the prosecutor's articulated reason for the strike was pretextual. However, the trial justice found, without hesitation, that the prosecutor properly set forth a race-neutral reason for the strike and that he did not harbor a racially discriminatory purpose, explaining that "[t]he fact remains that the State of Rhode Island * * * prosecuted this man's cousin. That's reason enough for me, on its face, to allow [the prosecutor] to exercise a challenge. I find that the reason for doing so is completely plausible, credible and rational."

The defendant has offered no reason, save for critiquing the persuasiveness of the articulated rationale, for us to disturb the trial justice's appraisal of the prosecutor's state of mind—an evaluation we accord "great deference." Price, 706 A.2d at 935. The prosecutor's reason was not facially implausible or unpersuasive so as to compel a finding that it was

---

[13] Although the challenged juror was not of the same race as defendant—an African-American male—this fact is irrelevant to the Batson inquiry; the United States Supreme Court has "eliminated the requirement that a criminal defendant share the same race as a challenged juror * * *." Pona, 926 A.2d at 602 (citing Powers v. Ohio, 499 U.S. 400, 415 (1991)).

- 27 -

pretextual. See Austin, 642 A.2d at 678 ("[T]he trial judge reasonably found that the prosecutor exercised a peremptory challenge because the prospective juror's son was incarcerated at the ACI on a robbery conviction. Although the trial justice found that this relationship was an insufficient reason to excuse the juror for cause, it is certainly sufficient to verify its race-neutral character."); see, e.g., United States v. Charlton, 600 F.3d 43, 53-54 (1st Cir. 2010) (recognizing as a race-neutral justification the prosecutor's decision to strike an African-American prospective juror whose son was incarcerated "for a crime similar to the one charged against [the defendant]"); United States v. Hendrix, 509 F.3d 362, 370 (7th Cir. 2007) (recognizing that striking minority jurors because they have "relatives in prison * * * is a valid and race-neutral basis * * *[;] [j]urors with relatives in prison may sympathize with a defendant, or have feelings of animosity against the prosecution"); United States v. Crawford, 413 F.3d 873, 875 (8th Cir. 2005) ("There is no Batson violation when a juror is dismissed because the juror's relatives have been prosecuted or convicted of a crime * * *."); Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004) (upholding as a "facially reasonable race-neutral" ground the prosecutor's decision to strike an African-American prospective juror whose brother had been convicted of possession of cocaine); Nieto v. State, 365 S.W.3d 673, 677, 679 (Tex. Crim. App. 2012) (upholding as a race-neutral justification the prosecutor's decision to strike an African-American prospective juror who shared a last name with defendants that the prosecutor had recently prosecuted). We therefore affirm the trial justice's denial of defendant's Batson challenge.

## IV

## Vouching

We next turn to defendant's contention that the state impermissibly utilized the cooperation agreements between the state and Fullen and Perez to suggest that the state had

special knowledge that Fullen and Perez were testifying truthfully. In this context, we have remarked that "[o]ne means through which improper vouching may occur is by admission of plea agreements phrased in a manner that suggests that the government has special knowledge that its witness is speaking the truth." State v. Diefenderfer, 970 A.2d 12, 32-33 (R.I. 2009) (quoting State v. Chakouian, 537 A.2d 409, 412 (R.I. 1988)). Improper vouching also arises when "the prosecution place[s] the prestige of the government behind the witness." Id. at 33 (quoting Chakouian, 537 A.2d at 412). Nonetheless, we have recognized that a "mere statement in a plea agreement that a witness promises to speak 'truthfully' does not by itself constitute improper vouching." Id. (quoting Chakouian, 537 A.2d at 412). Along similar lines, "a statement in a plea agreement that perjury charges will be brought if the defendant makes any false statement under oath[,]" without more, is likewise insufficient to establish improper vouching. Id. (quoting Chakouian, 537 A.2d at 412).

In this case, defendant focuses on the state's use of the cooperation agreements during closing argument. The defendant argues that by referencing the portion of the cooperation agreements that warned of reinstatement of the maximum allowable sentence and perjury charges for failure to testify truthfully, the state suggested that it had special knowledge that Fullen and Perez were truthful; because the jury was led to believe that the witnesses had been given the benefit of their bargain and had not been prosecuted for perjury, the argument goes, the state improperly vouched for the truthfulness of these witnesses. We reject this contention.

At the outset, we note that defendant has failed to preserve any challenge to the prosecutor's closing argument. The defendant made no objection to the now-challenged remarks. To preserve "the issue of prejudicial impropriety in a closing argument, a defendant must not only make an objection at the time when the allegedly improper comment is made, but

he or she must also make a request for a cautionary instruction or move for a mistrial." State v. Fortes, 922 A.2d 143, 149 (R.I. 2007); see also State v. Remy, 910 A.2d 793, 800 (R.I. 2006). The defendant has failed to comply with even this initial preservation hurdle.

The defendant vigorously disputes this conclusion, arguing that, because he raised a pretrial objection to the admissibility of the cooperation agreements, which the trial justice stated would be "protected," and renewed this objection before each cooperation agreement was admitted, this issue has been preserved. We disagree. The defendant's objections before and during trial concerned the admissibility of the agreements. The defendant raises a different appellate challenge; he does not claim simply that the cooperation agreements should have been excluded, but instead argues that the prosecutor, while referencing the agreements in his closing argument, improperly vouched for the truthfulness of Fullen and Perez. Clearly, the trial objections did not encompass the now-challenged comment during closing argument.

In any event, this aspect of defendant's appeal, even if it had been preserved, is without merit. To the extent defendant attempted to lodge an appellate attack on the admissibility of the cooperation agreements themselves, the trial justice's decision is amply supported by our decision in Diefenderfer. Although the cooperation agreements require truthfulness on the part of the cooperating witnesses and warn that perjury charges will be initiated if the witnesses give false testimony, these statements, standing alone, do not constitute improper vouching. See Diefenderfer, 970 A.2d at 33; Chakouian, 537 A.2d at 412. This conclusion makes sense; "the promise by a party to a plea [or cooperation] agreement that he or she will speak truthfully 'is the same promise he or she makes when called as a witness at trial[,]'" and the specter of a perjury prosecution for testifying falsely is a reality all witnesses confront. Diefenderfer, 970 A.2d at 33

n.36 (quoting Chakouian, 537 A.2d at 412); see G.L. 1956 § 11-33-1(a) (defining crime of perjury).

In the face of this established law, defendant focuses in this appeal on the prosecutor's statements during closing argument. In support of his position, defendant cites to the Ninth Circuit's decision in United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980), where the prosecutor stated, during closing argument, the following about the cooperating witness: "If he was caught lying as to material facts in any one of these matters, then his plea agreement would be called off. The charges of first-degree murder would be reinstated, and he would stand a very good likelihood of going to the gas chamber." In this case, defendant seizes on the similarity between the prosecutor's statement in Roberts that the cooperating witness would be "going to the gas chamber" and the prosecutor's statement in this case that false testimony would result in reinstatement of the maximum allowable sentence and initiation of perjury charges.

We are not persuaded. The prosecutor's gas-chamber statement in Roberts was not the basis for the court's finding of impermissible vouching; rather, the impermissible vouching arose from the prosecutor's statement that a state-police officer had attended the trial on "a mission * * * to sit and listen to the testimony of [the cooperating witness]." Roberts, 618 F.2d at 533; see id. at 532 ("We hold the prosecutor committed reversible error by using [the state-police officer's] presence to argue for [the cooperating witness's] credibility."); id. at 534 ("The prosecutor in this case referred to evidence not in the record by declaring that [the officer] was monitoring [the witness's] testimony. * * * In effect, the prosecutor was telling the jury that another witness could have been called to support [the witness's] testimony. This was error."). The prosecutor's statements in this case were well-grounded in the record evidence of the cooperation agreements; he merely recited the consequences of failing to abide by the terms of

the cooperation agreement, and those consequences were already outlined in the four corners of those agreements. Therefore, we reject defendant's argument that the state engaged in improper vouching.

### V

### Motion for New Trial

Finally, we turn to defendant's contention that the trial justice erroneously denied his motion for a new trial. "When a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." Smith, 39 A.3d at 673 (quoting State v. Clark, 974 A.2d 558, 569 (R.I. 2009)). Compliance with this standard requires three steps: "[t]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting State v. Vargas, 21 A.3d 347, 354 (R.I. 2011)). If this process leads the trial justice to "the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Id. (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)).

Our review of a trial justice's ruling on a motion for a new trial is deferential; "[i]f the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Smith, 39 A.3d at 673 (quoting State v. Horton, 871 A.2d 959, 967 (R.I. 2005)). "We employ this deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an

especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Paola, 59 A.3d 99, 104 (R.I. 2013) (quoting State v. Texieira, 944 A.2d 132, 141 (R.I. 2008)).

In this case, defendant assails the trial justice's credibility determinations; he contends that Perez and Fullen were not worthy of belief because their cooperation with the state colored their testimony and, conversely, that Walker, who had no motive to testify against Pona to receive favorable treatment, should have been deemed credible. Additionally, defendant argues that the criminal records of Fullen and Perez make their testimony suspect, and he further points out that Perez gave inconsistent versions of Jennifer's murder to police. We are unconvinced.

In the mine-run of cases, credibility battles are won or lost in Superior Court. A defendant's disagreement with a trial justice's credibility determinations "is not a sufficient basis to warrant the granting of a motion for new trial." Paola, 59 A.3d at 104 (quoting State v. Rivera, 987 A.2d 887, 903 (R.I. 2010)). Because the trial justice has observed the witnesses testify, he or she is in a better position than this Court to assess their credibility. Id.; see also Rivera, 987 A.2d at 903. Thus, we will uphold a trial justice's credibility determination "unless the trial justice clearly erred * * * or 'overlooked or misconceived relevant and material evidence.'" Paola, 59 A.3d at 104 (quoting State v. Banach, 648 A.2d 1363, 1368 (R.I. 1994)).

This case is no exception to this general rule. The trial justice recognized that Fullen and Perez each "arrived with baggage." Nonetheless, the trial justice found their testimony to be "unvarnished and unembellished * * *, in a word, credible." On the other hand, the trial justice deemed Walker's testimony to be "pathetic and desperate" and characterized it as "perjury." He found that "no rational juror charged with the responsibility of judging credibility would or could rely on Walker's specious and inane trial testimony," and he referred to Walker's "mendacious

lame efforts to exonerate [defendant]." The trial justice expressed his belief that, ironically, Walker "became the [s]tate's strongest witness" because his testimony was "so absurd and so ridiculous." In sum, the trial justice determined that "[t]he guilty verdicts in this trial were fully justified beyond any doubt."

The defendant has failed to demonstrate that the trial justice, who observed firsthand the testimony of these witnesses, clearly erred or overlooked or misconceived relevant and material evidence. Therefore, we affirm the trial justice's denial of defendant's motion for a new trial.

**The End**

After thirteen years, two trials, two appeals, and assorted collateral litigation,[14] the defendant and those responsible for cutting the life of this fifteen-year-old girl tragically short, in a brutal assault on our system of justice, have nonetheless been afforded the benefits of the constitutional process each sought to subvert. The defendant, Charles Pona, has had his day in court, and the rule of law has prevailed. The name "Jennifer Rivera" forever will be associated with virtue and valor. We affirm the conviction.

For the reasons articulated above, we close the final chapter in this chronicle. We affirm the judgment below and remand the papers to the Superior Court.

---

[14] See Rivera v. Rhode Island, 402 F.3d 27, 30 & n.1, 31 n.3 (1st Cir. 2005) (42 U.S.C. § 1983 suit brought by Jennifer's family members against the state, the City of Providence, the Attorney General, two prosecutors, and multiple Providence police officers for failure to protect her); Rivera v. Rhode Island, 312 F. Supp. 2d 175, 176-77 (D.R.I. 2004) (same); In re Court Order Dated October 22, 2003, 886 A.2d 342, 344-48 (R.I. 2005) (appeal of members of news media who received contempt citations for violating a trial court order prohibiting the publication of information or photographs in connection with defendant's trial for Jennifer's murder); see also Pona I, 948 A.2d at 942-54 (appeal from defendant's first trial for Jennifer's murder); Pona, 926 A.2d at 596-616 (affirming defendant's convictions relating to his murder of Feliciano).



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Charles Pona.

**CASE NO:**    No. 2010-345-C.A.
                (P1/02-2571 AG)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  May 23, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

          Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

          For State:  Jane M. McSoley
                    Department of Attorney General

          For Defendant:  George J. West, Esq.